(Slip Opinion) OCTOBER TERM, 2017 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UPPER SKAGIT INDIAN TRIBE *v.* LUNDGREN ET VIR

CERTIORARI TO THE SUPREME COURT OF WASHINGTON

No. 17–387.   Argued March 21, 2018—Decided May 21, 2018

The Upper Skagit Indian Tribe purchased a roughly 40-acre plot of land and then commissioned a boundary survey. The survey convinced the Tribe that about an acre of its land lay on the other side of a boundary fence between its land and land owned by Sharline and Ray Lundgren. The Lundgrens filed a quiet title action in Washington state court, invoking the doctrines of adverse possession and mutual acquiescence, but the Tribe asserted sovereign immunity from the suit. Ultimately, the State Supreme Court rejected the Tribe's immunity claim and ruled for the Lundgrens, reasoning that, under *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation,* 502 U. S. 251, tribal sovereign immunity does not apply to *in rem* suits.

*Held*: *Yakima* addressed not the scope of tribal sovereign immunity, but a question of statutory interpretation of the Indian General Allotment Act of 1887. That Act authorized the President to allot parcels of reservation land to individual tribal members and directed the United States eventually to issue fee patents to the allottees as private individuals. In 1934, Congress reversed course but made no attempt to withdraw the lands already conveyed. As a result, Indian reservations sometimes contain both trust land held by the United States and fee-patented land held by private parties. *Yakima* concerned the tax consequences of this intermixture. This Court had previously held that §6 of the General Allotment Act could no longer be read as allowing States to impose *in personam* taxes on transactions between Indians on fee-patented land within a reservation. *Moe* v. *Confederated Salish and Kootenai Tribes of Flathead Reservation,* 425 U. S. 463, 479–481. The Court reached a different conclusion in *Yakima* with respect to *in rem* state taxes, holding that the state collection of property taxes on fee-patented land within reserva-

Syllabus

tions was still allowed under §6.  502 U. S., at 265.  In short, *Yakima* sought only to interpret a relic of a statute in light of a distinguishable precedent; it resolved nothing about the law of sovereign immunity.

Acknowledging this, the Lundgrens now ask the Court to affirm on an alternative, common-law ground: that the Tribe cannot assert sovereign immunity because this suit relates to immovable property located in Washington State, purchased by the Tribe in the same manner as a private individual.  Because this alternative argument did not emerge until late in this case, the Washington Supreme Court should address it in the first instance.  Pp. 3–7.

187 Wash. 2d 857, 389 P. 3d 569, vacated and remanded.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined.  ROBERTS, C. J., filed a concurring opinion, in which KENNEDY, J., joined.  THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–387

_____

## UPPER SKAGIT INDIAN TRIBE, PETITIONER *v.* SHARLINE LUNDGREN, ET VIR

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF WASHINGTON

[May 21, 2018]

JUSTICE GORSUCH delivered the opinion of the Court.

Lower courts disagree about the significance of our decision in *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251 (1992). Some think it means Indian tribes lack sovereign immunity in *in rem* lawsuits like this one; others don't read it that way at all.* We granted certiorari to set things straight. 583 U. S. \_\_\_ (2017).

Ancestors of the Upper Skagit Tribe lived for centuries along the Skagit River in northwestern Washington State. But as settlers moved across the Cascades and into the region, the federal government sought to make room for them by displacing native tribes. In the treaty that followed with representatives of the Skagit people and others, the tribes agreed to "cede, relinquish, and convey"

———————

\* Compare 187 Wash. 2d 857, 865–869, 389 P. 3d 569, 573–574 (2017) (case below); *Cass County Joint Water Resource Dist.* v. *1.43 Acres of Land in Highland Twp.*, 2002 ND 83, 643 N. W. 2d 685, 691–693 (2002) (conforming to the Washington Supreme Court's interpretation of *Yakima*), with *Hamaatsa, Inc.* v. *Pueblo of San Felipe*, 2017–NMSC–007, 388 P. 3d 977, 986 (2016) (disagreeing); *Cayuga Indian Nation of N. Y.* v. *Seneca County*, 761 F. 3d 218, 221 (CA2 2014) (same).

their lands to the United States in return for $150,000 and other promises. Treaty of Point Elliott, Jan. 22, 1855, 12 Stat. 927; see *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 676 (1979); *United States* v. *Washington*, 384 F. Supp. 312, 333 (WD Wash. 1974).

Today's dispute stems from the Upper Skagit Tribe's efforts to recover a portion of the land it lost. In 1981, the federal government set aside a small reservation for the Tribe. 46 Fed. Reg. 46681. More recently, the Tribe has sought to purchase additional tracts in market transactions. In 2013, the Tribe bought roughly 40 acres where, it says, tribal members who died of smallpox are buried. The Tribe bought the property with an eye to asking the federal government to take the land into trust and add it to the existing reservation next door. See 25 U. S. C. §5108; 25 CFR §151.4 (2013). Toward that end, the Tribe commissioned a survey of the plot so it could confirm the property's boundaries. But then a question arose.

The problem was a barbed wire fence. The fence runs some 1,300 feet along the boundary separating the Tribe's land from land owned by its neighbors, Sharline and Ray Lundgren. The survey convinced the Tribe that the fence is in the wrong place, leaving about an acre of its land on the Lundgrens' side. So the Tribe informed its new neighbors that it intended to tear down the fence; clearcut the intervening acre; and build a new fence in the right spot.

In response, the Lundgrens filed this quiet title action in Washington state court. Invoking the doctrines of adverse possession and mutual acquiescence, the Lundgrens offered evidence showing that the fence has stood in the same place for years, that they have treated the disputed acre as their own, and that the previous owner of the Tribe's tract long ago accepted the Lundrens' claim to the land lying on their side of the fence. For its part, the Tribe asserted sovereign immunity from the suit. It relied upon

the many decisions of this Court recognizing the sovereign authority of Native American tribes and their right to "the common-law immunity from suit traditionally enjoyed by sovereign powers." *Michigan* v. *Bay Mills Indian Community*, 572 U. S. ___, ___ (2014) (slip op., at 5) (internal quotation marks omitted).

Ultimately, the Supreme Court of Washington rejected the Tribe's claim of immunity and ruled for the Lundgrens. The court reasoned that sovereign immunity does not apply to cases where a judge "exercis[es] in rem jurisdiction" to quiet title in a parcel of land owned by a Tribe, but only to cases where a judge seeks to exercise *in personam* jurisdiction over the Tribe itself. 187 Wash. 2d 857, 867, 389 P. 3d 569, 573 (2017). In coming to this conclusion, the court relied in part on our decision in *Yakima*. Like some courts before it, the Washington Supreme Court read *Yakima* as distinguishing *in rem* from *in personam* lawsuits and "establish[ing] the principle that . . . courts have subject matter jurisdiction over in rem proceedings in certain situations where claims of sovereign immunity are asserted." 187 Wash. 2d, at 868, 389 P. 3d, at 574.

That was error. *Yakima* did not address the scope of tribal sovereign immunity. Instead, it involved only a much more prosaic question of statutory interpretation concerning the Indian General Allotment Act of 1887. See 24 Stat. 388.

Some background helps dispel the misunderstanding. The General Allotment Act represented part of Congress's late Nineteenth Century Indian policy: "to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into the society at large." *Yakima, supra,* at 254; *In re Heff*, 197 U. S. 488, 499 (1905). It authorized the President to allot parcels of reservation land to individual tribal members. The law then directed the United States to hold the allotted parcel

in trust for some years, and afterwards issue a fee patent
to the allottee. 24 Stat. 389. Section 6 of the Act, as
amended, provided that once a fee patent issued, "each
and every allottee shall have the benefit of and be subject
to the laws, both civil and criminal, of the State or Territory
in which they may reside" and "all restrictions as to sale,
incumbrance, or taxation of said land shall be removed."
25 U. S. C. §349.

In 1934, Congress reversed course. It enacted the Indian
Reorganization Act, 48 Stat. 984, to restore "the principles
of tribal self-determination and self-governance" that
prevailed before the General Allotment Act. *Yakima*, 502
U. S., at 255. "Congress halted further allotments and
extended indefinitely the existing periods of trust applica-
ble to" parcels that were not yet fee patented. *Ibid.*; see 25
U. S. C. §§461–462. But the Legislature made no attempt
to withdraw lands already conveyed to private persons
through fee patents (and by now sometimes conveyed to
non-Indians). As a result, Indian reservations today
sometimes contain two kinds of land intermixed in a kind
of checkerboard pattern: trust land held by the United
States and fee-patented land held by private parties. See
*Yakima, supra*, at 256.

*Yakima* concerned the tax consequences of this checker-
board. Recall that the amended version of §6 of the
General Allotment Act rendered allottees and their fee-
patented land subject to state regulations and taxes. 25
U. S. C. §349. Despite that, in *Moe* v. *Confederated Salish
and Kootenai Tribes of Flathead Reservation*, 425 U. S.
463 (1976), this Court held that §6 could no longer be read
as allowing States to impose *in personam* taxes (like those
on cigarette sales) on transactions between Indians on fee-
patented land within a reservation. *Id.,* at 479–481.
Among other things, the Court pointed to the impracticality
of using the ownership of a particular parcel within a
reservation to determine the law governing transactions

taking place upon it. See *id.,* at 478–479. Despite *Moe* and some years later, this Court in *Yakima* reached a different conclusion with respect to *in rem* state taxes. The Court held that allowing States to collect property taxes on fee-patented land within reservations was still allowed by §6. *Yakima*, *supra,* at 265. Unlike the *in personam* taxes condemned in *Moe*, the Court held that imposing *in rem* taxes only on the fee-patented squares of the checkerboard was "not impracticable" because property tax assessors make "parcel-by-parcel determinations" about property tax liability all the time. *Yakima*, *supra,* at 265. In short, *Yakima* sought only to interpret a relic of a statute in light of a distinguishable precedent; it resolved nothing about the law of sovereign immunity.

Commendably, the Lundgrens acknowledged all this at oral argument. Tr. of Oral Arg. 36. Instead of seeking to defend the Washington Supreme Court's reliance on *Yakima*, they now ask us to affirm their judgment on an entirely distinct alternative ground. At common law, they say, sovereigns enjoyed no immunity from actions involving immovable property located in the territory of another sovereign. As our cases have put it, "[a] prince, by acquiring private property in a foreign country, . . . may be considered as so far laying down the prince, and assuming the character of a private individual." *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 145 (1812). Relying on this line of reasoning, the Lundgrens argue, the Tribe cannot assert sovereign immunity because this suit relates to immovable property located in the State of Washington that the Tribe purchased in the "the character of a private individual."

The Tribe and the federal government disagree. They note that immunity doctrines lifted from other contexts do not always neatly apply to Indian tribes. See *Kiowa Tribe of Okla.* v. *Manufacturing Technologies, Inc.*, 523 U. S. 751, 756 (1998) ("[T]he immunity possessed by Indian tribes is not coextensive with that of the States"). And

since the founding, they say, the political branches rather than judges have held primary responsibility for determining when foreign sovereigns may be sued for their activities in this country. *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 486 (1983); *Ex parte Peru*, 318 U. S. 578, 588 (1943).

We leave it to the Washington Supreme Court to address these arguments in the first instance. Although we have discretion to affirm on any ground supported by the law and the record that will not expand the relief granted below, *Thigpen* v. *Roberts*, 468 U. S. 27, 30 (1984), in this case we think restraint is the best use of discretion. Determining the limits on the sovereign immunity held by Indian tribes is a grave question; the answer will affect all tribes, not just the one before us; and the alternative argument for affirmance did not emerge until late in this case. In fact, it appeared only when the United States filed an *amicus* brief in this case—after briefing on certiorari, after the Tribe filed its opening brief, and after the Tribe's other *amici* had their say. This Court has often declined to take a "first view" of questions that make their appearance in this posture, and we think that course the wise one today. *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005).

The dissent is displeased with our decision on this score, but a contradiction lies at the heart of its critique. First, the dissent assures us that the immovable property exception applies with irresistible force—nothing more than a matter of "hornbook law." *Post,* at 3–10 (opinion of THOMAS, J.). But then, the dissent claims that allowing the Washington Supreme Court to address that exception is a "grave" decision that "casts uncertainty" over the law and leaves lower courts with insufficient "guidance." *Post,* at 3, 13–14. Both cannot be true. If the immovable property exception presents such an easy question, then it's hard to see what terrible things could happen if we allow

the Washington Supreme Court to answer it. Surely our state court colleagues are no less versed than we in "hornbook law," and we are confident they can and will faithfully apply it. And what if, instead, the question turns out to be more complicated than the dissent promises? In that case the virtues of inviting full adversarial testing will have proved themselves once again. Either way, we remain sanguine about the consequences.

The dissent's other objection to a remand rests on a belief that the immovable property exception was the source of "the disagreement that led us to take this case." *Post,* at 1. But this too is mistaken. As we've explained, the courts below and the certiorari-stage briefs before us said precisely nothing on the subject. Nor do we understand how the dissent might think otherwise—for its essential premise is that *no* disagreement exists, or is even possible, about the exception's scope. The source of confusion in the lower courts that led to our review was the one about *Yakima*, see *supra*, at 1, n., and we have dispelled it. That is work enough for the day. We vacate the judgment and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–387

_____

UPPER SKAGIT INDIAN TRIBE, PETITIONER *v.*
SHARLINE LUNDGREN, ET VIR

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
WASHINGTON

[May 21, 2018]

CHIEF JUSTICE ROBERTS, with whom JUSTICE KENNEDY joins, concurring.

I join the opinion of the Court in full.

But that opinion poses an unanswered question: What precisely is someone in the Lundgrens' position supposed to do? There should be a means of resolving a mundane dispute over property ownership, even when one of the parties to the dispute—involving non-trust, non-reservation land—is an Indian tribe. The correct answer cannot be that the tribe always wins no matter what; otherwise a tribe could wield sovereign immunity as a sword and seize property with impunity, even without a colorable claim of right.

The Tribe suggests that the proper mode of redress is for the Lundgrens—who purchased their property long before the Tribe came into the picture—to negotiate with the Tribe. Although the parties got off on the wrong foot here, the Tribe insists that negotiations would run more smoothly if the Lundgrens "understood [its] immunity from suit." Tr. of Oral Arg. 60. In other words, once the Court makes clear that the Lundgrens ultimately have no recourse, the parties can begin working toward a sensible settlement. That, in my mind at least, is not a meaningful remedy.

The Solicitor General proposes a different out-of-court

solution.  Taking up this Court's passing comment that a disappointed litigant may continue to assert his title, see *Block* v. *North Dakota ex rel. Board of Univ. and School Lands*, 461 U. S. 273, 291–292 (1983), the Solicitor General more pointedly suggests that the Lundgrens should steer into the conflict: Go onto the disputed property and chop down some trees, build a shed, or otherwise attempt to "induce [the Tribe] to file a quiet-title action."  Brief for United States as *Amicus Curiae* 23–24.  Such brazen tactics may well have the desired effect of causing the Tribe to waive its sovereign immunity.  But I am skeptical that the law requires private individuals—who, again, had no prior dealings with the Tribe—to pick a fight in order to vindicate their interests.

The consequences of the Court's decision today thus seem intolerable, unless there is another means of resolving property disputes of this sort.  Such a possibility was discussed in the Solicitor General's brief, the Lundgrens' brief, and the Tribe's reply brief, and extensively explored at oral argument—the exception to sovereign immunity for actions to determine rights in immovable property.  After all, "property ownership is not an inherently sovereign function."  *Permanent Mission of India to United Nations* v. *City of New York*, 551 U. S. 193, 199 (2007).  Since the 18th century, it has been a settled principle of international law that a foreign state holding real property outside its territory is treated just like a private individual.  *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 145 (1812).  The same rule applies as a limitation on the sovereign immunity of States claiming an interest in land located within other States.  See *Georgia* v. *Chattanooga*, 264 U. S. 472, 480–482 (1924).  The only question, as the Solicitor General concedes, Brief for United States as *Amicus Curiae* 25, is whether different principles afford Indian tribes a broader immunity from actions involving off-reservation land.

ROBERTS, C. J., concurring

I do not object to the Court's determination to forgo consideration of the immovable-property rule at this time. But if it turns out that the rule does not extend to tribal assertions of rights in non-trust, non-reservation property, the applicability of sovereign immunity in such circumstances would, in my view, need to be addressed in a future case. See *Michigan* v. *Bay Mills Indian Community*, 572 U. S. \_\_\_, \_\_\_, n. 8 (2014) (slip op., at 16, n. 8) (reserving the question whether sovereign immunity would apply if a "plaintiff who has not chosen to deal with a tribe[ ] has no alternative way to obtain relief for off-reservation commercial conduct"). At the very least, I hope the Lundgrens would carefully examine the full range of legal options for resolving this title dispute with their neighbors, before crossing onto the disputed land and firing up their chainsaws.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–387

_____

### UPPER SKAGIT INDIAN TRIBE, PETITIONER *v.* SHARLINE LUNDGREN, ET VIR

#### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF WASHINGTON

[May 21, 2018]

JUSTICE THOMAS, with whom JUSTICE ALITO joins, dissenting.

We granted certiorari to decide whether "a court's exercise of *in rem* jurisdiction overcome[s] the jurisdictional bar of tribal sovereign immunity." Pet. for Cert. i; 583 U. S. \_\_\_ (2017). State and federal courts are divided on that question, but the Court does not give them an answer. Instead, it holds only that *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251 (1992), "resolved nothing about the law of [tribal] sovereign immunity." *Ante,* at 5. Unfortunately, neither does the decision today—except to say that courts cannot rely on *County of Yakima.* As a result, the disagreement that led us to take this case will persist.

The Court easily could have resolved that disagreement by addressing respondents' alternative ground for affirmance. Sharline and Ray Lundgren—whose family has maintained the land in question for more than 70 years—ask us to affirm based on the "immovable property" exception to sovereign immunity. That exception is settled, longstanding, and obviously applies to tribal immunity—as it does to every other type of sovereign immunity that has ever been recognized. Although the Lundgrens did not raise this argument below, we have the discretion to reach it. I would have done so. The immovable-property

exception was extensively briefed and argued, and its application here is straightforward. Addressing the exception now would have ensured that property owners like the Lundgrens can protect their rights and that States like Washington can protect their sovereignty. Because the Court unnecessarily chooses to leave them in limbo, I respectfully dissent.

I

As the Court points out, the parties did not raise the immovable-property exception below or in their certiorari-stage briefs. See *ante,* at 6. But this Court will resolve arguments raised for the first time in the merits briefs when they are a "'"predicate to an intelligent resolution" of the question presented'" and thus "'fairly included' within the question presented." *Caterpillar Inc.* v. *Lewis*, 519 U. S. 61, 75, n. 13 (1996) (quoting *Ohio* v. *Robinette*, 519 U. S. 33, 38 (1996); this Court's Rule 14.1). The Court agrees that the immovable-property exception is necessary to an intelligent resolution of the question presented, which is why it remands that issue to the Washington Supreme Court. See *ante,* at 6–7. But our normal practice is to address the issue ourselves, unless there are "good reasons to decline to exercise our discretion." *Jones* v. *United States*, 527 U. S. 373, 397, n. 12 (1999) (plurality opinion).

There are no good reasons here. The Court's only proffered reason is that the applicability of the immovable-property exception is a "grave question" that "will affect all tribes, not just the one before us." *Ante,* at 6.[1] The

_____

[1] The Court does not question the adequacy of the briefing or identify factual questions that need further development. Nor could it. The immovable-property exception received extensive attention in the parties' briefs, see Brief for Respondents 9–26; Reply Brief 13–24, and the Government's *amicus* brief, see Brief for United States 25–33. Most

exception's applicability might be "grave," but it is also clear.  And most questions decided by this Court will affect more than the parties "before us"; that is one of the primary reasons why we grant certiorari.  See this Court's Rule 10(c) (explaining that certiorari review is usually reserved for cases involving "an important question of federal law" that has divided the state or federal courts).  Moreover, the Court's decision to forgo answering the question presented is no less "grave."  It forces the Lundgrens to squander additional years and resources litigating their right to litigate.  And it casts uncertainty over the sovereign rights of States to maintain jurisdiction over their respective territories.

Contrary to the Court's suggestion, *ante,* at 6–7, I have no doubt that our state-court colleagues will faithfully interpret and apply the law on remand.  But I also have no doubt that this Court "ha[s] an 'obligation . . . to decide the merits of the question presented'" in the cases that come before us.  *Encino Motorcars, LLC* v. *Navarro*, 579 U. S. \_\_\_, \_\_\_ (2016) (THOMAS, J., dissenting) (slip op., at 1). The Court should have discharged that obligation here.

## II

I would have resolved this case based on the immovable-property exception to sovereign immunity.  That exception is well established.  And it plainly extends to tribal immunity, as it does to every other form of sovereign immunity.

## A

The immovable-property exception has been hornbook

_____

of the oral argument likewise focused on the immovable-property exception.  See Tr. of Oral Arg. 14–16, 19–29, 34–51, 54–59.  And when asked at oral argument what else it could say about the exception if it had more time, the Tribe had no response.  See *id*., at 19–21.

law almost as long as there have been hornbooks. For centuries, there has been "uniform authority in support of the view that there is no immunity from jurisdiction with respect to actions relating to immovable property." Lauterpacht, The Problem of Jurisdictional Immunities of Foreign States, 28 Brit. Y. B. Int'l Law 220, 244 (1951).[2] This immovable-property exception predates both the founding and the Tribe's treaty with the United States. Cornelius van Bynkershoek, a renowned 18th-century jurist,[3] stated that it was "established" that "property which a prince has purchased for himself in the dominions of another . . . shall be treated just like the property of private individuals." De Foro Legatorum Liber Singularis 22 (G. Laing transl. 2d ed. 1946). His conclusion echoed

---

[2] There is some disagreement about the outer bounds of this exception—for example, whether it applies to tort claims related to the property or to diplomatic embassies. See, *e.g.,* Letter from J. Tate, Acting Legal Adviser, Dept. of State, to Acting Attorney General P. Perlman (May 19, 1952), 26 Dept. of State Bull. 984, 984–985 (Tate Letter); see also C. Bynkershoek, De Foro Legatorum Liber Singularis 22–23 (G. Laing transl. 2d ed. 1946) (explaining there is "no unanimity" regarding attaching a foreign prince's debts to immovable property). But there is no dispute that it covers suits concerning ownership of a piece of real property used for nondiplomatic reasons. See Tate Letter 984; Brief for United States as *Amicus Curiae* 27–28. In other words, there is no dispute that it applies to *in rem* suits like this one.

[3] Considered "a jurist of great reputation" by Chief Justice Marshall, *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 144 (1812), "Bynkershoek's influence in the eighteenth century [w]as enormous," Adler, The President's Recognition Power, in The Constitution and the Conduct of American Foreign Policy 133, 153, n. 19 (G. Adler & L. George eds. 1996) (internal quotation marks omitted). Madison, for example, consulted Bynkershoek's works (on the recommendation of Jefferson) while preparing to draft the Constitution. See Letter from Thomas Jefferson to James Madison (Feb. 20, 1784), in 4 The Works of Thomas Jefferson 239, 248 (P. Ford ed. 1904); Letter from James Madison to Thomas Jefferson (Mar. 16, 1784), in 2 The Writings of James Madison 34, 43 (G. Hunt ed. 1901).

the 16th-century legal scholar Oswald Hilliger. See *ibid.*
About a decade after Bynkershoek, Emer de Vattel ex-
plained that, when "sovereigns have fiefs and other pos-
sessions in the territory of another prince; in such cases
they hold them after the manner of private individuals." 3
The Law of Nations §83, p. 139 (C. Fenwick transl. 1916);
see also E. de Vattel, The Law of Nations §115, p. 493 (J.
Chitty ed. 1872) ("All landed estates, all immovable prop-
erty, by whomsoever possessed, are subject to the jurisdic-
tion of the country").[4]

The immovable-property exception is a corollary of the
ancient principle of *lex rei sitae*. Sometimes called *lex
situs* or *lex loci rei sitae*, the principle provides that "land
is governed by the law of the place where it is situated."
F. Wharton, Conflict of Laws §273, p. 607 (G. Parmele ed.,
3d ed. 1905). It reflects the fact that a sovereign "cannot
suffer its own laws . . . to be changed" by another sover-
eign. H. Wheaton, Elements of International Law §81,
p. 114 (1866). As then-Judge Scalia explained, it is "self-
evident" that "[a] territorial sovereign has a primeval
interest in resolving all disputes over use or right to use of
real property within its own domain." *Asociacion de
Reclamantes* v. *United Mexican States*, 735 F. 2d 1517,
1521 (CADC 1984). And because "land is so indissolubly
connected with the territory of a State," a State "cannot
permit" a foreign sovereign to displace its jurisdiction by
purchasing land and then claiming "immunity." Compe-
tence of Courts in Regard to Foreign States, 26 Am. J. Int'l
L. Supp. 451, 578 (1932) (Competence of Courts). An
assertion of immunity by a foreign sovereign over real
property is an attack on the sovereignty of "the State of

––––––––

[4] De Vattel's work was "a leading treatise" of its era. *Jesner* v. *Arab
Bank, PLC*, *ante*, at 9, n. 3 (GORSUCH, J., concurring in part and concur-
ring in judgment).

the situs." *Ibid.*

The principle of *lex rei sitae* was so well established by the 19th century that Chancellor James Kent deemed it "too clear for discussion." 2 Commentaries on American Law 429, n. a (4th ed. 1840). The medieval jurist Bartolus of Sassoferatto had recognized the principle 500 years earlier in his commentary on conflicts of law under the Justinian Code. See Bartolus, Conflict of Laws 29 (J. Beale transl. 1914).[5] Bartolus explained that, "when there is a question of any right growing out of a thing itself, the custom or statute of the place where the thing is should be observed." *Ibid.* Later authorities writing on conflicts of law consistently agreed that *lex rei sitae* determined the governing law in real-property disputes.[6] And this Court likewise held, nearly 200 years ago, that "the nature of

———————

[5] In the foreword to his translation of Bartolus, Joseph Henry Beale described him as "the most imposing figure among the lawyers of the middle ages," whose work was "the first and standard statement of the doctrines of the Conflict of Laws." Bartolus, Conflict of Laws, at 9.

[6] See, *e.g.,* F. von Savigny, Conflict of Laws 130 (W. Guthrie transl. 1869) ("This principle [of *lex rei sitae*] has been generally accepted from a very early time"); G. Bowyer, Commentaries on Universal Public Law 160 (1854) ("[W]here the matter in controversy is the right and title to land or other immovable property, the judgment pronounced in the *forum rei sitae* is held conclusive in other countries"); H. Wheaton, Elements of International Law §81, p. 114 (G. Wilson ed. 1936) ("[T]he law of a place where real property is situated governs exclusively as to the tenure, title, and the descent of such property"); J. Story, Commentaries on the Conflict of Laws §424, p. 708 (rev. 3d ed. 1846) ("The title . . . to real property can be acquired, passed, and lost only according to the *Lex rei sitae*"); J. Westlake, Private International Law *56 ("The right to possession of land can only be tried in the courts of the *situs*"); L. Bar, International Law 241–242 (G. Gillespie transl. 1883) (noting that, in "the simpler case of immoveables," "[t]he *lex rei sitae* is the rule"); F. Wharton, 1 Conflict of Laws §273, p. 607 (G. Parmele ed., 3d ed. 1905) ("Jurists of all schools, and courts of all nations, are agreed in holding that land is governed by the law of the place where it is situated").

sovereignty" requires that "[e]very government" have "the exclusive right of regulating the descent, distribution, and grants of the domain within its own boundaries." *Green* v. *Biddle*, 8 Wheat. 1, 12 (1823) (Story, J.).

The acceptance of the immovable-property exception has not wavered over time. In the 20th century, as nations increasingly owned foreign property, it remained "well settled in International law that foreign state immunity need not be extended in cases dealing with rights to interests in real property." Weber, The Foreign Sovereign Immunities Act of 1976: Its Origin, Meaning, and Effect, 3 Yale J. Int'l L. 1, 33 (1976). Countries around the world continued to recognize the exception in their statutory and decisional law. See Competence of Courts 572–590 (noting support for the exception in statutes from Austria, Germany, Hungary, and Italy, as well as decisions from the United States, Austria, Chile, Czechoslovakia, Egypt, France, Germany, and Romania). "All modern authors are, in fact, agreed that in all disputes *in rem* regarding immovable property, the judicial authorities of the State possess as full a jurisdiction over foreign States as they do over foreign individuals." C. Hyde, 2 International Law 848, n. 33 (2d ed. 1945) (internal quotation marks omitted).

The Restatement of Foreign Relations Law reflects this unbroken consensus. Every iteration of the Restatement has deemed a suit concerning the ownership of real property to be "outside the scope of the principle of [sovereign] immunity of a foreign state." Restatement of Foreign Relations Law of the United States (Proposed Official Draft) §71, Comment *c,* p. 228 (1962); see also Restatement (Second) of Foreign Relations Law of the United States §68(b) (1965) (similar); Restatement (Third) of Foreign Relations Law of the United States §455(1)(c) (1987) (denying that immunity exists for "claims . . . to immovable property in the state of the forum"); Restate-

ment (Fourth) of Foreign Relations Law of the United States §456(2) (Tent. Draft No. 2, Mar. 22, 2016) (recognizing "jurisdiction over a foreign state in any case in which rights in immovable property situated in the United States are in issue"). Sovereign immunity, the First Restatement explains, does not bar "an action to obtain possession of or establish an ownership interest in immovable property located in the territory of the state exercising jurisdiction." §71(b), at 226.

Given the centuries of uniform agreement on the immovable-property exception, it is no surprise that all three branches of the United States Government have recognized it. Writing for a unanimous Court and drawing on Bynkershoek and De Vattel, Chief Justice Marshall noted that "the property of a foreign sovereign is not distinguishable by any legal exemption from the property of an ordinary individual." *Schooner Exchange* v. *McFaddon*, 7 Cranch 116, 144–145 (1812). Thus, "[a] prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to the territorial jurisdiction . . . and assuming the character of a private individual." *Id.,* at 145.[7] The Court echoed this reasoning over a century later, holding that state sovereign immunity does not extend to "[l]and acquired by one State in another State." *Georgia* v. *Chattanooga*, 264 U. S. 472, 480 (1924). In 1952, the State Department acknowledged that "[t]here is agreement[,] supported by practice, that sovereign immunity should not be claimed or granted in actions with respect to real property." Tate Letter 984.[8] Two decades

_____

[7] The Skagit Tribe entered into its treaty with the United States four decades later. See Treaty of Point Elliott, Apr. 11, 1859, 12 Stat. 927. The treaty does not mention sovereignty or otherwise alter the rule laid out in *Schooner Exchange.*

[8] This declaration has long been "the official policy of our Government." *Alfred Dunhill of London, Inc.* v. *Republic of Cuba*, 425 U. S.

later, Congress endorsed the immovable-property exception by including it in the Foreign Sovereign Immunities Act of 1976. See 28 U. S. C. §1605(a)(4) ("A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which . . . rights in immovable property situated in the United States are in issue"). This statutory exception was "meant to codify the *pre-existing* real property exception to sovereign immunity recognized by international practice." *Permanent Mission of India to United Nations* v. *City of New York*, 551 U. S. 193, 200 (2007) (emphasis added; internal quotation marks omitted).

The Court does not question any of the foregoing authorities. Nor did the parties provide any reason to do so. The Government, when asked to identify its "best authority for the proposition that the baseline rule of common law was total immunity, including *in rem* actions," pointed to just two sources. See Tr. of Oral Arg. 29; Brief for United States as *Amicus Curiae* 10, 26. The first was Hamilton's statement that "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." The Federalist No. 81, p. 487 (C. Rossiter ed. 1961) (emphasis deleted). Yet "property ownership is not an inherently sovereign function," *Permanent Mission*, *supra*, at 199, and Hamilton's general statement does not suggest that immunity is automatically available or is not subject to longstanding exceptions. The Government also cited *Schooner Exchange*. But as explained above, that

_____

682, 698 (1976). The State Department has reaffirmed it on several occasions. See, *e.g.,* Dept. of State, J. Sweeney, Policy Research Study: The International Law of Sovereign Immunity 24 (1963) ("The immunity from jurisdiction of a foreign state does not extend to actions for the determination of an interest in immovable—or real—property in the territory. This limitation on the immunity of the state is of long standing").

decision expressly acknowledges the immovable-property exception. The Government's unconvincing arguments cannot overcome more than six centuries of consensus on the validity of the immovable-property exception.

B

Because the immovable-property exception clearly applies to both state and foreign sovereign immunity, the only question is whether it also applies to tribal immunity. It does.

Just last Term, this Court refused to "exten[d]" tribal immunity "beyond what common-law sovereign immunity principles would recognize." *Lewis* v. *Clarke*, 581 U. S. ___, ___–___ (2017) (slip op., at 7–8). Tribes are "domestic dependent nations," *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17 (1831), that "no longer posses[s] the full attributes of sovereignty," *United States* v. *Wheeler*, 435 U. S. 313, 323 (1978) (internal quotation marks omitted). Given the "limited character" of their sovereignty, *ibid.*, Indian tribes possess only "the common-law immunity from suit traditionally enjoyed by sovereign powers," *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 58 (1978). That is why this Court recently declined an invitation to make tribal immunity "broader than the protection offered by state or federal sovereign immunity." *Lewis*, 581 U. S., at ___ (slip op., at 8). Accordingly, because States and foreign countries are subject to the immovable-property exception, Indian tribes are too. "There is no reason to depart from these general rules in the context of tribal sovereign immunity." *Id.,* at ___ (slip op., at 7).

In declining to reach the immovable-property exception, the Court highlights two counterarguments that the Tribe and the United States have raised for why the exception should not extend to tribal immunity. Neither argument has any merit.

First, the Court notes that "immunity doctrines lifted

from other contexts do not always neatly apply to Indian tribes." *Ante,* at 5 (citing *Kiowa Tribe of Okla.* v. *Manufacturing Technologies, Inc.*, 523 U. S. 751, 756 (1998)). But the Court's authority for that proposition merely states that tribal immunity "is not coextensive with that of *the States.*" *Id.*, at 756 (emphasis added). Even assuming that is so, it does not mean that the Tribe's immunity can be more expansive than any recognized form of sovereign immunity, including the immunity of the United States and foreign countries. See *Lewis*, *supra*, at \_\_\_–\_\_\_ (slip op., at 7–8). And the Tribe admits that this Court has previously limited tribal immunity to conform with analogous "limitations . . . in suits against the United States." Reply Brief 22. No one argues that the United States could claim sovereign immunity if it wrongfully asserted ownership of private property in a foreign country—the equivalent of what the Tribe did here. The United States plainly would be subject to suit in that country's courts. See Competence of Courts 572–590.

Second, the Court cites two decisions for the proposition that "since the founding . . . the political branches rather than judges have held primary responsibility for determining when foreign sovereigns may be sued for their activities in this country." *Ante,* at 6 (citing *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 486 (1983); *Ex parte Peru*, 318 U. S. 578, 588 (1943)). But those cases did not involve tribal immunity. They were admiralty suits in which foreign sovereigns sought to recover ships they allegedly owned. See *Verlinden*, *supra*, at 486 (citing cases involving ships allegedly owned by Italy, Peru, and Mexico); *Ex parte Peru*, *supra*, at 579 (mandamus action by Peru regarding its steamship). Those decisions were an extension of the common-law principle, recognized in *Schooner Exchange*, that sovereign immunity applies to vessels owned by a foreign sovereign. See *Berizzi Brothers Co.* v. *S. S. Pesaro*, 271 U. S. 562, 571–576 (1926). These

cases encourage deference to the political branches on sensitive questions of foreign affairs. But they do not suggest that courts can ignore longstanding limits on sovereign immunity, such as the immovable-property exception. And they do not suggest that courts can abdicate their judicial duty to decide the scope of tribal immunity—a duty this Court exercised just last Term. See *Lewis*, *supra*, at \_\_\_–\_\_\_ (slip op., at 5–8).[9]

In fact, those present at "the founding," *ante,* at 6, would be shocked to learn that an Indian tribe could acquire property in a State and then claim immunity from that State's jurisdiction.[10] Tribal immunity is "a judicial doctrine" that is not mandated by the Constitution. *Kiowa*, 523 U. S., at 759. It "developed almost by accident," was reiterated "with little analysis," and does not reflect the realities of modern-day Indian tribes. See *id.,* at 756–758. The doctrine has become quite "exorbitant," *Michigan* v. *Bay Mills Indian Community*, 572 U. S. \_\_\_, \_\_\_ (2014) (GINSBURG, J., dissenting) (slip op., at 1), and it has been implausibly "exten[ded] . . . to bar suits arising out of an

—————

[9] These decisions about ships, even on their own terms, undercut the Tribe's claim to immunity here. The decisions acknowledge a "distinction between possession and title" that is "supported by the overwhelming weight of authority" and denies immunity to a foreign sovereign that has "title . . . without possession." *Republic of Mexico* v. *Hoffman*, 324 U. S. 30, 37–38 (1945); see, *e.g.*, *Long* v. *The Tampico*, 16 F. 491, 493–501 (SDNY 1883). That distinction would defeat the Tribe's claim to immunity because the Lundgrens have possession of the land. See 187 Wash. 2d 857, 861–864, 389 P. 3d 569, 571–572 (2017).

[10] Their shock would not be assuaged by the Government's proposed remedy. The Government suggests that the Lundgrens should force a showdown with the Tribe by chopping down trees or building some structure on the land. See Brief for United States as *Amicus Curiae* 23–24. If the judge-made doctrine of tribal immunity has come to a place where it forces individuals to take the law into their own hands to keep their own land, then it will have crossed the threshold from mistaken to absurd.

Indian tribe's commercial activities conducted outside its territory," *id.,* at \_\_\_ (THOMAS, J., dissenting) (slip op., at 1).

Extending it even further here would contradict the bedrock principle that each State is "entitled to the sovereignty and jurisdiction over all the territory within her limits." *Lessee of Pollard* v. *Hagan*, 3 How. 212, 228 (1845); accord, *Texas* v. *White*, 7 Wall. 700, 725 (1869); *Willamette Iron Bridge Co.* v. *Hatch*, 125 U. S. 1, 9 (1888) (collecting cases). Since 1812, this Court has "entertain[ed] no doubt" that "the title to land can be acquired and lost only in the manner prescribed by the law of the place where such land is situate[d]." *United States* v. *Crosby*, 7 Cranch 115, 116 (1812) (Story, J.). Justice Bushrod Washington declared it "an unquestionable principle of general law, that the title to, and the disposition of real property, must be exclusively subject to the laws of the country where it is situated." *Kerr* v. *Devisees of Moon*, 9 Wheat. 565, 570 (1824). This Court has been similarly emphatic ever since. See, *e.g., Munday* v. *Wisconsin Trust Co.*, 252 U. S. 499, 503 (1920) ("long ago declared"); *Arndt* v. *Griggs*, 134 U. S. 316, 321 (1890) ("held repeatedly"); *United States* v. *Fox*, 94 U. S. 315, 320 (1877) ("undoubted"); *McCormick* v. *Sullivant*, 10 Wheat. 192, 202 (1825) ("an acknowledged principle of law"). Allowing the judge-made doctrine of tribal immunity to intrude on such a fundamental aspect of state sovereignty contradicts the Constitution's design, which "'leaves to the several States a residuary and inviolable sovereignty.'" *New York* v. *United States*, 505 U. S. 144, 188 (1992) (quoting The Federalist No. 39, at 256).

\*    \*    \*

The Court's failure to address the immovable-property exception in this case is difficult to justify. It leaves our colleagues in the state and federal courts with little more

guidance than they had before.  It needlessly delays relief for the Lundgrens, who must continue to litigate the threshold question whether they can litigate their indisputable right to their land.  And it does not address a clearly erroneous tribal-immunity claim: one that asserts a sweeping and absolute immunity that no other sovereign has ever enjoyed—not a State, not a foreign nation, and not even the United States.

I respectfully dissent.